## CIRCUIT COURT OF WASHINGTON COUNTY

In re Adoption
of Shane David Buchanan

**August 17, 1987**

By JUDGE CHARLES H. SMITH, JR.

The court has reviewed the file in this matter, the applicable case law, and given mature consideration to the evidence presented at the hearing on August 7, 1987. In consideration of all of which the court finds as follows:

Thomas Martin Buchanan and Debra Kay Ferrell Buchanan were divorced on April 6, 1981, by decree of the Circuit Court of Washington County. To the marriage was born one child, Shane David Buchanan, born April 20, 1977, who is the subject of this adoption proceeding. Mrs. Buchanan (Ray) was remarried on September 4, 1981, to Mr. Tony Lee Ray, one of the petitioners herein. Mr. Buchanan has not remarried. Mr. and Mrs. Ray own a home in Bristol, Virginia, where they live with Shane and a year-old daughter. Mr. Ray works for Paty Lumber Co. in Kingsport.

Mr. and Mrs. Ray both made a most favorable impression from the stand. Both are mild-mannered, pleasant, well-groomed and seemingly intelligent. They were polite, yet obviously determined and united in their resolve to have Shane adopted by Mr. Ray. To their credit, neither displayed any anger or hostility nor attempted to "sling mud" at Mr. Buchanan. The Rays are obviously Christian people who worship regularly as a family. Though somewhat young, they appear to be mature, industrious, and well-settled. From all appearances and from the corroborated testimony, they are a very happy couple and a close-knit family.

Mr. Ray professes a strong love for and bond with Shane. The evidence was that he treats him as his own

son and makes no distinction between him and his natural daughter. They participate in the normal father-son activities together, playing ball, fishing, etc. There is no doubt about Mr. Ray's love for Shane. According to Mrs. Ray and other witnesses, Shane loves Mr. Ray and thinks of him as his father. To Mr. Ray's credit, according to everybody's testimony, he has never disparaged Mr. Buchanan in Shane's presence. This is something not often seen in these cases.

Mr. Buchanan is unmarried and works in his father's carpet business. He resides in an apartment located on the business premises. Mr. Buchanan has worked in the carpet business now for about three years. Before that, he was in Virginia Beach where he lived and worked for about two years. Mr. Buchanan has had a history of sporadic work, some of which was less than full-time, during his short adult life. He has always professed financial woes to Mrs. Ray and offered this as a reason for not paying child support.

There has been a continuing problem with Mr. Buchanan paying his child support ever since he separated from Mrs. Ray. Mr. Buchanan has, admittedly, not paid child support in some six years. He has been in court several times for this and has been sentenced to jail for failure to pay. Mr. Buchanan, also admittedly, has not even seen Shane in six years except for a chance meeting at the Rays' home two years ago when he went there to measure for carpet. The evidence revealed that there have been no cards or letters, no gifts or phone calls from Mr. Buchanan to Shane in six years. In spite of this, Mr. Buchanan professes a desire to rekindle his relationship with Shane and resume his parental role. He alleges he has been hampered in his efforts in this regard by the actions of Mrs. Ray. Admittedly, Mrs. Ray did deny visitation to Mr. Buchanan soon after their separation because he would not pay support. At a hearing held in the Bristol Juvenile and Domestic Relations District Court on November 29, 1982, an order was entered which set child support arrearage at $2,440.00 and abated future payments on motion of Mrs. Ray. Although the order does not so state, the credible testimony was to the effect that this abatement was in consideration of Mr. Buchanan's professed inability to pay, his planned remarriage and not wanting to have

"the law on his back" for arrearages, and a statement that he wanted nothing further to do with Shane. Mr. Buchanan was present at the hearing. He denied the statement under oath.

Mr. Buchanan really did not speak in terms of real love and affection for Shane as being his motivation. His thrust seemed more toward wanting Shane to maintain the Buchanan name and learn about his heritage. Mr. Buchanan proudly traces his ancestors back to President James Buchanan.

Mr. Buchanan, to his credit, did not seem bitter nor hostile toward the Rays. He offered no reason why Mr. Ray would not be a suitable adoptive parent nor why Shane's best interest would not be served thereby. In fact, again to his credit, Mr. Buchanan praised Mr. Ray and commended him in his good relationship with Shane and with him over the years.

Mr. Buchanan's mother testified on his behalf. She had a pleasant demeanor. She is an attractive, well-groomed, seemingly intelligent lady. She, quite obviously, loves her grandson very much. She has maintained a close relationship with him over the years. In fact, at one point, she took Mrs. Ray to court to get visitation. Fortunately, the matter was settled with an agreed visitation schedule for Mrs. Buchanan. Mrs. Buchanan really found no fault with the Rays. Again, her main opposition seemed to be to the proposed change of Shane's name and not to the adoption. She admittedly, after learning of this, told Shane that he would not seem like her grandson if he changed his name. With all due respect, in the court's estimation, Mrs. Buchanan seems to be the primary obstacle to the father's consent. She is the one who has maintained contact with Shane over the years; she is the one who obviously truly loves him; she is the one who enlisted a lawyer for her son to oppose this and she is the one who fears having her relationship with Shane severed by this proposed adoption.

Is the consent of the father in this case being withheld contrary to the best interest of the child? As stated to counsel in court, I know of no issue more weighty or important than one involving a termination of parental rights. The court does not take it lightly. In all my years on the juvenile and domestic relations bench, there

was nothing that touched my heart and conscience more. One of the most basic, important and best-protected tenets of our law is that the rights of parents are not to be lightly severed but are to be respected and preserved if at all in keeping with the best interests of the child.

The court is familiar with and has reviewed the case of *Malpass v. Morgan*, 213 Va. 393 (1972), cited by the father in support of his position. That case, indeed, is strikingly similar to the case at bar. In that case, the Supreme Court reversed the trial court's decision granting the adoption over the father's objection. The two cases, while similar, are easily distinguishable on the facts. In the *Malpass* case, there was never any time after the parents' separation and divorce that the father did not visit and/or attempt to visit his child. Even after remarrying and having another child and moving to Ohio, he continued to return to Virginia twice a year to see his child. Indeed, upon learning of the adoption petition, he actually moved his family from Ohio to Virginia "to contest the adoption." There had always been a continuing relationship. In the instant case, the father has, for all practical purposes, forsaken and forgotten his son. What stronger evidence could there be of this than his obstinate refusal to pay a minimal amount of child support, his failure to communicate by card, letter, phone or otherwise, his forgetfulness at Christmas and birthdays, and his total failure to visit his son in six years. He has taken absolutely no affirmative steps toward pursuing a father-son relationship. In fact, the only step he has taken has been a responsive one, to contest this adoption, and even this seems to have been at the instance of the paternal grandmother. He cannot complain of lack of access to the courts because he has been in court several times to respond to show cause rules. At any of these hearings or at any other time on petition initiated by him, he could have had his visitation rights litigated. In *Malpass* the father was litigating his visitation rights at the same time he was in court for child support.

What does little Shane think about all this? Obviously, he is not old enough to make up his own mind and has not yet reached the age of discretion. His consent is not required for this proceeding (Section 63.1-225 of the Code) nor would it be for a termination of parental rights

(Section 16.1-283 of the Code). The court declined an invitation by counsel for petitioners to talk with the child. The court felt it had a fair understanding of Shane's wishes from the hearsay testimony that was produced from both sides by agreement.

Shane is a normal, healthy, happy ten-year-old. He has been reared in a secure, stable environment with the Rays where he obviously has an abundance of love, affection, and attention. He is apparently intelligent and well-adjusted. He is a member of a thriving, wholesome family unit. He has stated more than once that he wants to be adopted and have his name the same as the rest of the family.

In the *Malpass* case the Supreme Court said:

> We do not intend to intimate that a child must be in a desperate situation before adoption may be ordered over the objection of a natural parent. And we agree with Morgan that it was not necessary to show in this case that the father had abandoned the child or was an unfit parent . . . .
>
> Where, as here, there is no question of the fitness of the non-consenting parent and he has not by conduct or previous legal action lost his rights to the child, it must be shown that continuance of the relationship between the two would be detrimental to the child's welfare. (*Id.* p. 399)

In this case there is no relationship to continue. In this case there is some evidence of abandonment. In this case there is some question of fitness because of the father's past neglectful conduct. Finally, in this case there is some evidence of abdication of parental ties by his acquiesence in the child support abatement proceeding.

In consideration of all of which, the court is of the opinion that the Rays are eminently well-qualified, morally suitable, and financially able to care for Shane, that the adoption would be in his best interest, that the father is "obstinately self-willed in refusing to concur and is acting prejudicially to the child's interests" and that a final order of adoption shall be entered omitting

58

the investigation and interlocutory order pursuant to Sections 63.1-226(c) and 63.1-231(b) of the Code.